IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CAMBER ENERGY, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION №. 4:17-cv-1436 |
| | § | |
| DISCOVER GROWTH FUND, and | § | JURY REQUESTED |
| FIFTH THIRD SECURITIES, INC., | § | |
| | § | |
| Defendants. | § | |
| _____ | § | |

**CAMBER ENERGY, INC.'S PETITION AND
REQUEST FOR TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION AND PERMANENT INJUNCTION**

TO THE HONORABLE JUDGE AND JURY OF SAID COURT:

1.  Plaintiff Camber Energy, Inc., formerly Lucas Energy, Inc., prior to January 3, 2017  ("***Camber***") alleges as follows:

2.  **PRELIMINARY STATEMENT**:

3.  This petition seeks injunctive relief to avoid the destruction of a publicly traded company.  The injunctive relieve seeks to halt the unlimited conversion and sale of shares based on deceptive, incomplete, disputed and unconscionable documents.

4.    **PARTIES, JURISDICTION AND VENUE**:

5.    Camber is a Nevada Corporation headquartered at 450 Gears Road, Suite 860, Houston, Texas 77067.  Camber is a publicly traded company trading on the NYSE MKT ("**_NYSE_**") under the symbol "**_CEI_**".

6.    One Defendant is Discover Growth Fund ("**_Discover_**"), a foreign company which can be served care of ATTN: David Sims, Director, Suite #4-210, Governors Square, 23 Lime Tree Bay Avenue, P.O. Box 32311, Grand Cayman, KY1-1209.

7.    One Defendant is Fifth Third Securities, Inc. ("**_Fifth Third_**") which can be served at 38 Fountain Square Plaza, MD 10AT42, Cincinnati, Ohio 45263 1.513.534.7421 (phone); registered agent Corporation Service Company, 50 West Broad Street, Suite 1330, Columbus, OH 43215.

8.    This is a civil action where the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of a State and citizens or subjects of a foreign state or State.  Therefore, federal subject-matter jurisdiction exists under 28 U.S.C. §1332(a).  Additionally, the amount in controversy exceeds the sum or value specified by 28 U.S.C. §1332.

9.     This is a case of actual controversy within the jurisdiction of this Court. There is substantial uncertainty surrounding the rights of Plaintiff and Defendants. The Court may therefore declare the rights and other legal relations of the parties under 28 U.S.C. §2201. The Court may grant further necessary or proper relief under 28 U.S.C. §2202.

10.    To the extent necessary, supplemental jurisdiction exists under 28 U.S.C. §1367.

11.    Venue is proper under 28 U.S.C. §1391.

12.    International service of process, a restraining order, and injunctive relief are proper under 28 U.S.C. §2361.

13.    Injunctive relief is proper under FED. R. CIV. P. 65.

14.    **<u>SUPPORT</u>**:

15.    This Petition and Request for Temporary Restraining Order, Temporary Injunction and Permanent Injunction is supported by the affidavit of Mr. Anthony C. Schnur attached as Exhibit "A" and incorporated herein by reference as though set forth herein verbatim (the "***<u>Schnur Affidavit</u>***") and the 2 exhibits attached to the Schnur Affidavit which are incorporated herein by reference as though set forth herein verbatim.

16.   **FACTUAL BACKGROUND**:

17.   **A:  Overview of the Transaction**:

18.   Camber (formerly Lucas Energy) is a publicly-traded energy company that is actively engaged in the utilization, development, and production of crude oil, natural gas and natural gas liquids.  Camber has a balanced asset base in Texas and Oklahoma.

19.   Prior to April 6, 2016, Camber's Chief Executive Officer, Anthony C. Schnur ("**_Schnur_**") had several discussions with Brendan T. O'Neil of Discover to discuss an investment by Discover in Camber.

20.   Unknown by Camber at the time, the principals of Discover were identical to those of Ironridge Global Partners, LLC ("**_Ironridge_**") and Ironridge was the subject of a Securities and Exchange Commission ("**_SEC_**") Administrative proceeding.

21.   On June 23, 2015, the SEC issued an Order Instituting Administrative and Cease-And-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 (the "**_Order_**").   The Order states that "[b]etween April 2011 through March 2014, Ironridge willfully violated Sections 15(a) and 20(b) of the Securities Exchange Act of 1934 ("Exchange

Act"), and Global IV [a related entity] willfully violated Section 15(a) of the Exchange Act through Global IV's operation as an unregistered dealer by engaging in serial underwriting activity, providing related investment advice, and receiving and selling billions of shares in connection with self-described financing services for domestic microcap stock companies ("microcap issuers") explicitly designed to utilize the registration exemption contained in Section 3(a)(10) of the Securities Act of 1933 ("***Securities Act***")." The Order further states that "Global IV has willfully violated Section 15(a) of the Exchange Act, which prohibits a broker or dealer to effect transactions in any security without registering with the Commission . . . [and] Ironridge willfully violated Sections 15(a) and 20(b) of the Exchange Act".

22.   The SEC has aggressively continued its Administrative Proceeding against Ironridge.  Based on information and belief, which Camber intends to follow up on in discovery, as of February 1, 2017, the SEC administrative proceeding has been stayed pending a settlement by the parties, which Camber believes may include sanctions against Ironridge and potentially its principals.

23.    The Principals of Ironridge are David Sims, Brendan T. O'Neil, John C. Kirkland and Keith R. Coulston (the "***Principals***")[1].  David Sims is listed as a Director of Discover[2].  Brendan T. O'Neil, Keith R. Coulston and John C. Kirkland have participated as representatives of Discover in email correspondence with Camber (using Discover email addresses (i.e., emails from the dgfunds.com domain)).  The Principals have signed for Discover on Discover Growth Fund signature blocks.  The Principals have purported to act for, and represent, Discover on various emails.

24.    The allegations made by the SEC in the Order and the SEC's various pleadings[3] are significant and raise issues regarding Discover's compliance with applicable law, the ability of Discover's Principals to buy and sell securities, the motives of Discover and its potential for illegal actions.

---

[1]    See various Schedule 13Gs filed by Ironridge with the SEC (https://www.sec.gov/Archives/edgar/data/1342643/000114420415009139/v401534_sc13ga.htm, https://www.sec.gov/Archives/edgar/data/1486526/000114420414024318/v375566_sc13g.htm, and https://www.sec.gov/Archives/edgar/data/1322587/000114420414014312/v370959_sc13g.htm). Additional Schedule 13G's can be reviewed by going to the SEC's "Full-Text Search" for Edgar (https://searchwww.sec.gov/EDGARFSClient/jsp/EDGAR_MainAccess.jsp), and searching for text "ironridge global" in form type "SC 13G".

[2]    See footnote (1) on page 26 https://www.sec.gov/Archives/edgar/data/1309082/000158069516000830/lei-s3a_110116.htm

[3]    For example https://www.sec.gov/litigation/apdocuments/3-16649-event-42.pdf

25.    Based on information and belief, which Camber intends to follow up on in discovery, the Principals, during such time that Ironridge was subject to SEC administrative proceedings, created Discover to continue to undertake the same sorts of transactions and perpetrate the same types of frauds and illegal activities as the SEC alleges they undertook through Ironridge.

26.    On or about February 4, 2016, Camber entered into an agreement with Roth Capital Partners, LLC ("***Roth***") to try and raise capital/equity.  Essentially, Roth was acting as an agent for Camber and would receive a commission if Roth was successful in raising the capital/equity.  Shortly thereafter, Roth introduced Camber to Discover.

27.    On April 6, 2016, Camber, at that time Lucas Energy, entered into (i) a Securities Purchase Agreement with Discover, pursuant to which Camber sold Discover a redeemable convertible subordinated debenture, with a face amount of $530,000 (the "***Debenture***") and a warrant to initially purchase 1,384,616 shares of common stock (subject to adjustment thereunder) at an exercise price equal to $3.25 per share (the "***Warrant***") for $500,000; and (ii) a Stock Purchase Agreement, pursuant to which Camber agreed, among other things, subject to certain conditions, to sell up to 527 shares of Series C

redeemable convertible preferred stock to Discover (the "***Preferred Stock***" and together with the Debenture and Warrant, the "***Securities***").

28. The Securities Purchase Agreement, the Stock Purchase Agreement and the Securities shall be referred to as the "***Discover Documents***."  The Securities Purchase Agreement and the Stock Purchase Agreement are attached to the Schnur Affidavit as Exhibits "A-1" and "A-2", respectively, and are incorporated into this Pleading as though fully set forth herein verbatim.

29. In order to consummate the transaction to obtain a cash infusion, the Board of Directors of Camber had previously, on April 4, 2016, approved Camber's entry into the Discover Documents and Schnur had executed the Discover Documents.

30. However, the unreasonable interpretation of the material terms of such Discover Documents, the terms which could lead to triggering events, defaults, and exponential increases in the number of shares due to Discover, were not disclosed to Camber, prior to Camber agreeing to the terms of the transaction.

31. The Discover Documents were drafted in such a way as to obscure the true terms of such documents and the total number of shares of common stock that could be issuable by Camber thereunder.  The Discover Documents include

numerous cross references and defined terms, many of which are subject to
multiple interpretations, as well as several references which refer to sections
which do not exist.  Only after signing the documents did Camber and Mr.
Schnur learn that Discover's reading of the Discover Documents was that the
terms that applied were the strictest and most Camber unfriendly
interpretation possible.

32.    Unknown to Camber when the Discover Documents were executed was that
Discover's successive conversions/exercises of the Securities by Discover,
and the subsequent sale of a significant number of shares in connection
therewith, would significantly decrease the trading price of Camber's
common stock.  Discover would have known that Camber's stock price was
likely to fall below $1.00 per share and that pursuant to the terms of the
Discover Documents, which were extremely difficult to understand due to the
number of definitions and cross-references included in such documents, as
well as the number of errors in such documents, that the number of shares
Discover would be due and would continue to be due as a result thereof could
result in 100% dilution to existing shareholders of Camber.  Pursuant to
Discover's interpretation of the agreements, Discover can continue to request

additional shares without limit – forever – until Camber's share value is non-existent and Camber is delisted from the NYSE ensuring its demise.

33.  Discovery did not disclose that their unreasonable interpretations of the material terms of such Discover Documents would lead to triggering events, defaults, and exponential increases in the number of shares due to Discover, were not disclosed to Camber, prior to Camber agreeing to the terms of the transaction.

34.  Because the terms of certain Irrevocable Instructions which were required by Discover to be signed by Camber's transfer agent, provide that Camber is unable to instruct its transfer agent to disregard any conversion notice provided by Discover, even if materially incorrect, and because they further allow Discover to provide conversion/exercise notices directly to the transfer agent, which the transfer agent is contractually obligated (pursuant to the terms of the Irrevocable Instructions) to process those instructions immediately, Camber currently has no remedy to address the disputes above with Discover.

35.  **B:  Overview of the Conversions and Sales**:

36.  On October 7, 2016, Discover exercised the First Warrant in full and paid an aggregate of $4.5 million to Camber. On September 2, 2016, 53 shares of

Series C Preferred Stock were sold to Discover by Camber for $526,450. On November 17, 2016, the remaining 474 shares of Series C Preferred Stock were sold to Discover by Camber for $4,736,550.

37.   Discover required Camber to agree that certain triggering events under the Discover Documents had occurred as of November 2016, in order to induce Discover to agree to purchase the additional shares of Series C Preferred Stock. Camber had no bargaining position at that time and was forced to agree to Discover's terms in order to raise much needed capital. The result of the triggering event confirmation, which was not based in fact or the Discover Documents, was that the interest rates and other terms of the Discover Documents became significantly more onerous for Camber and more beneficial for Discover. Camber was forced to agree to the triggering events under duress and would not have agreed to such terms if it was able to raise money through third parties, something which it was unable to do as a result of the precipitous decline in its stock price which was caused by Discover's continuous conversions/exercises of the Securities and sales of shares.

38.   Each of the Securities are convertible or exercisable for shares of common stock of Camber, and include various conversion terms which are usurious, significantly dilutive to existing shareholders and unreasonable, and become

even more unreasonable when certain triggering events have occurred. Since October 7, 2016, Discover has requested Camber issue over 13.7 million shares of common stock of Camber under and pursuant to various Form S-1 and Form S-3 registration statements previously filed by Camber with the Securities and Exchange Commission ("**_SEC_**") and under Rule 144 of the Securities Act of 1933, as amended, in connection with the exercise of the Warrant and conversion of the Preferred Stock (collectively, the "**_Shares_**"). Notwithstanding the issuance of the Shares, the Securities continue to be convertible/exercisable for an astronomical number of additional shares.

39.   By November 7, 2016, Camber had received a total of $10 million.  Discover has compelled repayment at the expense of Camber and its shareholders believed to be in excess of $13.0 million, an amount that can continue to grow if unrestrained.   Discover has converted/exercised 13.7 million shares and sold them over the last 6 months, which has depressed the price of Camber common stock from $2.34 per share on October 7, 2016 to less than $0.25 per share now.  The original value of the converted/exercised shares would be in excess of $32.1 million dollars based on the prior trading price of Camber's stock.

40.     Camber currently has approximately 30 million shares outstanding as a result of Discover's conversions and exercises, which represents an increase of 88% compared to the approximately 16 million shares outstanding immediately prior to the first conversion/exercise by Discover of the Securities on October 7, 2016, which dilution is almost entirely caused by Discover's conversions/exercises.

41.     Due to Discover's sales of shares and the resulting decreases in Camber's stock price, Camber has lost over $28.2 million dollars in market capitalization.

42.     Based on information and belief, which Camber intends to follow up on in discovery, Discover is also shorting its stock, illegally, which allows Discover to further profit by the decrease in Camber's stock price (from over $2.60 in October 2016 to just below $0.25 as of the date of this Petition).

43.     Discover has been clearing the Camber Shares through Fifth Third.

44.     Specifically, Camber is aware, that pursuant to NakedShortReport (http://nakedshortreport.com/?index=CEI), Camber's common stock is one of the most heavily shorted stocks. The following chart demonstrates the unusual shorting activity.



45.    Additionally, pursuant to NakedShortReport, there is a significant uptick in naked short volume immediately preceding the conversions/exercises by Discover which took place on April 11, 2017 and April 26, 2017.  Due to this, and based on information and belief, which Camber intends to follow up on in discovery, Camber believes that Discover is illegally naked short selling Camber's common stock.

46.   **C:  Overview of the Disputed Discover Document Provisions**:

47.   Camber currently disputes Discover's interpretation of several key terms of the Discover Documents, including provisions in each of the Securities which provide for extensions of the time period designated for Discover's anti-dilution rights (i.e., the provisions which adjust, retroactively, the conversion price of the Securities when the price of Camber's common stock falls). These provisions are creating the most dilution to Camber shareholders and providing the most benefit to Discover, as they allow, pursuant to Discover's interpretation of those provisions, a never ending right for Discover to receive additional shares of Camber common stock. Camber contends that Discover's interpretation of those provisions are without merit and that the period for adjustment of the number of shares due to Discover for several of the Securities has already expired, due to the fact that those provisions of the Discover Documents include references to sections of such documents which either (a) do not exist; or (b) provide for no rights or requirements which are applicable to the terms of the provisions as interpreted by Discover. Camber has previously attempted to address these issues with Discover; however, Camber's concerns have been brushed off by Discover and Discover has

refused to consider Camber's interpretation of the provisions or further discuss them with Camber.

48.  Specifically, all of the Securities have nearly identical terms, which in summary provide:

- Discover the right to convert the principal amount of the Security (for the Debenture the $530,000 face amount, for the Warrant, the $4.5 million exercise price (issuable for 1,384,616 shares) and for the Preferred Stock, the $4.5 million purchase price) into common stock of Camber at a fixed conversion rate - $3.50 per share for the Debenture; $3.25 per share for the Warrant; and $3.25 per share for the Preferred Stock. Those amounts are fixed.

- That interest accrues on each Security (called a Conversion Premium in the Securities), payable upon conversion or early repayment, equal to the amount of 'interest' (Conversion Premium) which would be due on the principal amount of the Security (described in the paragraph above) based on the Interest Rate (described below) for a full seven years (the "***Conversion Premium***"). This 'interest' is due no matter when the Security is converted or repaid. In effect Discover receives seven years of interest day one that each Security is outstanding.

- The "***Interest Rate***" (called the Premium Rate in the Warrant and Dividend Rate in the Preferred Stock), starts off as 6% per annum for each Security and adjusts as described below, up to 24.95% per annum, if there is no Trigger Event (as defined below) and up to 34.95% per annum, if there is a Trigger Event (the Interest Rate adjusts upward by 10% automatically upon the occurrence of a Trigger Event). The Interest Rate adjusts upward by 1% for each $0.10 that the volume weighted average price of Camber's common stock falls below $2.75 per share (there is also a possible adjustment downwards in the Interest Rate if the stock rises above $3.75, but of course that will never happen as long as Discover continues to convert and sell). The Interest Rate is fixed for the Warrant when exercised (Discover claims it was 17% when exercised [i.e., Discover was due seven full years of interest on the $4.5 million principal amount of the Warrant immediately when exercised with interest at 17% per annum – an immediate 119% return on their original investment (17%  per year, multiplied by seven years), without factoring in the conversion terms described below], which includes a Trigger Event, which Camber disputes as described below, versus only 7% if no Trigger Event occurred), but continues to adjust for the Debenture and Preferred Stock until converted.

As Camber's stock price is currently approximately $0.25 per share, the Interest Rate on the Debenture and Preferred Stock has increased from 6% initially (16% factoring in the Trigger Event which Discover claims has occurred), to the full 24.95% (34.95% with the Trigger Event), as the stock has fallen by more than $2.40 (more than 24 times $0.10) in value. This represents an immediate 245% return on Discover's original investments (34.95% per year, multiplied by seven years) in connection with the Debenture and Preferred Stock (without factoring in the conversion rights described below).

- The Conversion Premium of each Security is convertible into common stock of Camber at a discount (thereby further increasing the effective interest rate of each Security). Specifically, the conversion rate of the Conversion Premium is equal to 95.0% of the average of the 5 lowest individual daily volume weighted average prices (VWAP) of Camber's common stock during the applicable Measurement Period (described below)(not to exceed the lowest sales price on the last day of the Measurement Period) less $0.05 per share, if no Trigger Event (described below) has occurred and 85.0% of the lowest VWAP during any Measurement Period (not to exceed 85.0% of the lowest sales price on the

last day of any Measurement Period), less $0.10 per share, if a Trigger Event has occurred. As such, as the VWAPs of Camber's common stock decrease as the conversion price decreases, Discover is due more and more shares. For the Warrant in particular this retroactive adjustment means that the number of shares Discover is due only goes up even as Discover is issued more shares which are then sold further decreasing Camber's stock price. Note that the share price not only declines due to sales by Discover, but also just due to dilution associated with the conversions (all things being equal one would expect the market capitalization (total shares outstanding x stock price) to remain consistent over time and as such as the number of outstanding shares increases with conversions it follows that the stock price should decline). Note also that the $0.05 and $0.10 discounts become more and more extreme as Camber's stock price decreases. For example, at $0.30 per share, the $0.10 discount represents a full 33.3% of the trading price, which percentage only increases as Camber's stock price decreases.

- The "***Measurement Period***" is the period beginning, if no Trigger Event has occurred, 30 trading days (if a Trigger Event has occurred 60 trading days), before the Notice Date (which is not defined in any of the Discover

Documents, but was meant to refer to the first exercise or conversion of the Security), and ending, if no Trigger Event has occurred, 30 trading days (or 60 days, if a Trigger Event has occurred) after the number of shares stated in the initial conversion/exercise notice have actually been received into Discover's designated brokerage account in electronic form and fully cleared for trading. In effect, Discover is provided a true-up whereby Camber has to issue additional shares if its stock price declines between the period during which Discover exercises/converts its Securities and sells shares (which continues for 30/60 days thereafter). Notwithstanding the above, for each day during the Measurement Period on which less than all of the conditions set forth in Section I.G.6.h (of each Security) exist (note this is the exact wording from each Security, referring to a Section I.G.6.h), 1 trading day is added to what otherwise would have been the end of the Measurement Period. As a result, in the event the conditions set forth in Section I.G.6.h are not in compliance, the Measurement Period continues indefinitely and the conversion price continues to adjust downward (and the number of shares Discover is due continues to adjust upward) as Camber's stock price declines. Again, this continues forever (subject to the

balance of the Debenture and number of Preferred Stock shares decreasing slightly as those Securities are converted).

49. Notwithstanding the above, there is no Section I.G.6. or Section I.G.6.h in the Warrant (the document skips from Section I.G.5 to I.G.7), no Section I.G.6.h in the Preferred Stock designation and a Section I.G.6.h in the Debenture which does not include any relevant conditions. As such, Camber contends that instead of continuing indefinitely, the Measurement Period expires 30 (or 60, depending on whether a Trigger Event occurred) trading days after Discover receives the full amount of shares they are due pursuant to their initial conversion/exercise notices under the Warrant, Preferred Stock and Debenture, which dates for the Warrant and Preferred Stock have already passed and which date for the Debenture began counting down on or around April 21, 2017. To date, Discover has failed to agree with this common sense interpretation of the terms of the Securities and instead insists that the references to Section I.G.6.h were meant to refer to various other sections of the Securities which define certain unreasonable and one-sided 'Equity Conditions' which Discover alleges are required to be met by Camber. Certain of those 'Equity Conditions' are impossible to cure and therefore, again, will result in the Measurement Period continuing forever. Those conditions

include a price above $1.50 per share – due to Discover's selling, the price will never go above $1.50 per share as long as Discover continues to sell and which is impossible for Camber to cure with the continuous conversions/exercises and sales by Discover.

50.   "***Trigger Events***" under the Securities (which increase the Interest Rate and extend the Measurement Period), include: if Camber does not for any reason timely comply with the reporting requirements of the Securities Exchange Act of 1934, including without limitation timely filing when first due all periodic reports. Discover has previously alleged that because Camber's Annual Report on Form 10-K (the "***Form 10-K***") for the year ended March 31, 2016, was not in Discover's interpretation, 'filed when first due' – we note that Camber filed a Form 12b-25 filing with the Securities and Exchange Commission (SEC) which provides an automatic 15 day extension of the filing date and thereafter filed the Form 10-K within the timeline required by the SEC – that a Trigger Event occurred under the Debenture and Warrant (which were both issued and outstanding as of that date) ***AND*** the Preferred Stock, which designation relating thereto wasn't even filed with the Secretary of State of Nevada until August 25, 2016 (the Form 10-K was filed on July 13, 2016) and which Preferred Stock held by Discover wasn't issued until

after that date, even though such Preferred Stock was not outstanding as of the date the Form 10-K was, in Discover's interpretation, not 'filed when first due' and even though the security representing the Preferred Stock was not filed or issued until well after such date.  The Form 10-K was originally due on June 29, 2016, but pursuant to the Form 12b-25 extension provided by the SEC, was not due until extended, until July 14, 2016.

51.     Camber disputes the occurrence of a Trigger Event because it believes all of its periodic reports were filed 'when first due' when including SEC allowed and customary filing date extensions – i.e., Camber has not filed a late report with the SEC – but also because the Preferred Stock was not issued or outstanding when the purported Trigger Event claimed by Discover occurred – at a minimum no Trigger Event occurred under the Preferred Stock in connection with the Form 10-K not being 'filed when first due' since that Security was not issued until after that event.

52.     Again, because the terms of certain Irrevocable Instructions which were required by Discover to be signed by Camber's transfer agent, provide that Camber is unable to instruct its transfer agent to disregard any conversion notice provided by Discover, even if materially incorrect, and because the transfer agent is contractually obligated to process immediately, Camber

currently has no remedy to address the disputes above with Discover. Discover has further failed to cease converting the Securities until an understanding regarding the interpretation of those provisions of the Discover Documents can be reached.  In the event the terms of the Discover Documents were appropriately enforced – Discover would be due significantly less shares of Camber than it currently claims are due, and Camber's shareholders would be subject to significantly less future dilution.

53.   **D:  The Bottom Line**:

54.   The catastrophic effect of the Discover Documents is so devastating that the Discover Documents are prima facia unconscionable.   The Discover Documents are opposed to public policy in that they will permit Discover to strip Camber of its value and business well beyond the simple repayment of its debt. Furthermore, the Discover Documents harm the shareholders of Camber who have had to deal with continual decreases in the value of their securities.

55.   All conditions precedent to the causes of action have been performed or have occurred or have been done.

56. **ARBITRATION CLAUSE UNCONSCIONABILITY**:

57. The arbitration provision is substantively unconscionable.  To the extent this assertion is a factual claim and/or legal claim it shall be so construed.  The Supreme Court has held that the Federal Arbitration Act 9 U.S.C. §4 requires courts – not arbitrators – to address any challenge to the arbitration clause itself.  *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006).

58. The test for substantive unconscionability is whether, "…the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties made the contract." *In re FirstMerit Bank*, 52 S.W.3d 749, 757 (Tex.2001).

59. The ultimate issue of whether an arbitration agreement is against public policy or unconscionable is a question of law for the court.  See *In re Poly-Am., L.P.*, 262 S.W.3d 337, 349 (Tex. 2008); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003).

60. The arbitration provision in the Discover Documents reads:  "H. Arbitration. Any dispute, controversy, claim or action of any kind arising out of, relating to, or in connection with this Agreement, or in any way involving Company

and Investor or their respective Affiliates, including any issues of arbitrability, will be resolved solely by final and binding arbitration in English before a retired judge at JAMS International, or its successor, in the Territory of the Virgin Islands, pursuant to the most expedited and Streamlined Arbitration Rules and procedures available.  Any interim or final award may be entered and enforced by any court of competent jurisdiction.  The final award will include the prevailing party's reasonable arbitration, expert witness and attorney fees, costs and expenses.  Notwithstanding the foregoing, <u>Investor may in its sole discretion bring an action in the U.S. District Court</u> for the District of Nevada or the Middle District of Florida in addition to, in lieu of, or in aid of arbitration."  (Emphasis added).

61.    "We have recognized that an arbitration agreement may be illusory if a party can unilaterally avoid the agreement to arbitrate.  *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 230 & n. 2 (Tex.2003)."  *In re Palm Harbor Homes, Inc*., 195 SW 3d 672, 677 (Tex. 2006).

62.    "An arbitration agreement is illusory if it binds one party to arbitrate, while allowing the other to choose whether to arbitrate."  *Royston, Rayzor, Vickery, Williams v. Lopez*, 467 SW 3d 494, 505 (Tex. 2015).

63.     The Fifth Circuit recognized that the "…one-sidedness of the duty to arbitrate raises a serious question as to the clause's validity." *Iberia Credit Bureau, Inc. v. Cingular Wireless LLC*, 379 F.3d 159, 169 (5th Cir. 2004).  Further, the Court wrote "On the contrary, the offensive provision here is the sentence in which the customer, but not Centennial, is required to arbitrate.  Saving the clause would require not that we excise an invalid excrescence and then send the pared-down contract to arbitration but that we redraft the contract to add important new material — a duty on Centennial's part to arbitrate.  The severability clause therefore cannot accomplish the needed repair." *Iberia Credit Bureau*, 379 F.3d at 171.

64.     **CAUSES OF ACTION**:

65.     **FIRST CLAIM – FRAUDULENT MISREPRESENTATION (AS TO DISCOVER)**:

66.     Camber realleges and incorporates by reference paragraphs 1 through 63 above as though fully set forth herein.

67.     Discover made false and fraudulent material misrepresentations and misleading statements of fact to Camber concerning the nature of Discover, its relationship with Ironridge, the identity of the Principals of both Ironridge and Discover, the nature of the transaction suggested by Discover.

68.  The misrepresentations were conveyed to Camber by Brendan O'Neil on behalf of Discover.

69.  At the time the statements and representations were made, Discover was aware of the falsity of the representations.

70.  Discover made the misrepresentations with the intent to deceive Camber, and with the intent that Camber would rely on the misrepresentations and therefore enable Discover to continuously convert and sell Camber shares.

71.  Camber, however, relied on the misrepresentations and did not discover the scheme until well after the Discover Documents were executed by Schnur.

72.  Discover's actions were fraudulent, malicious and done willfully, in conscious disregard of the rights of Camber, in that the actions were calculated to injure Camber.   As such, Camber is entitled to recover, in addition to actual damages, exemplary damages in an amount to be determined at trial to punish Discover and deter future misconduct.

73.  **SECOND CLAIM – FRAUD BY NONDISCLOSURE (AS TO DISCOVER)**:

74.  Camber realleges and incorporates by reference paragraphs 1 through 72 above as though fully set forth herein.

75.    Discover made false and fraudulent material misrepresentations of fact to Camber; specifically, false and misleading statements and representations concerning the nature of Discover, its relationship with Ironridge, the identity of the Principals of both Ironridge and Discover, and the nature of the transaction suggested by Discover. Specifically, Discover failed to notify Camber of its relationship to Ironridge and the prior claims raised by the SEC in connection with the Order, which if known to Camber prior to the date the Discover Documents were entered into would have resulted in Camber never entering into such Discover Documents.

76.    The misrepresentations were conveyed to Camber by Brendan T. O'Neil on behalf of Discover.

77.    At the time the statements and representations were made, Discover was aware of the misrepresentations.

78.    Discover made the misrepresentations with the intent to deceive Camber, and with the intent that Camber would rely on the misrepresentations and therefore enable Discover to continuously convert and sell Camber shares.

79.    Camber, however, relied on the misrepresentations and did not discover the scheme until well after the Discover Documents were executed by Schnur.

80.    Discover's actions were fraudulent, malicious and done willfully, in conscious

disregard of the rights of Camber, in that the actions were calculated to injure Camber.   As such, Camber is entitled to recover, in addition to actual damages, exemplary damages in an amount to be determined at trial to punish Discover and deter future misconduct.

81. **THIRD   CLAIM   –   CIVIL   CONSPIRACY   (AGAINST   ALL DEFENDANTS)**:

82. Camber realleges and incorporates by reference paragraphs 1 through 80 above as though fully set forth herein.

83. On or about October 7, 2016, and continuing thereafter, Defendants, and each of them combined, confederated, agreed and conspired to unlawfully convert and sell Camber shares in furtherance of the fraud alleged in this petition.

84. All of the Defendants had a meeting of the minds on their course of action which involved overt acts to further their objective to deprive Camber of its value and financial opportunities.

85. Camber sustained damages in the amount of approximately $67.6 million – consisting of $28.2 million in lost market cap and $39.4 million in lost projects.

86. **FOURTH CLAIM – USURY (AS TO DISCOVER)**:

87. Camber realleges and incorporates by reference paragraphs 1 through 85 above as though fully set forth herein.

88. While there are no specific usury rules or legislation under Cayman law, if the levels of payments arising under a loan/finance agreement are considered by a Cayman court to be penal in nature, they will be deemed unenforceable under Cayman law.

89. By November 7, 2016 Camber had received a total of $10 million.  Discover has compelled repayment at the expense of Camber and its shareholders believed to be in excess of $13.0 million, an amount that can continue to grow if unrestrained.  Discover has converted/exercised 13.7 million shares and sold them over the last 6 months, which has depressed the price of Camber's common stock from $2.34 per share on October 7, 2016 to less than $0.25 per share now.  The original value of the converted/exercised shares would be in excess of $32.1 million dollars based on the prior trading price of Camber's stock.

90. As Discover sells the shares it receives from Camber upon the conversion/exercise of the Securities, those sales trigger stock price decreases and as a result, increases in the number of shares Discover is due upon future

conversion/exercise of the Securities.   Since conversions/exercises by Discover have begun, each successive conversion/exercise of the Securities and sale of shares of common stock of Camber received in connection therewith, has caused the price of Camber's stock to decrease, which have on average, forced an increase in the number of shares Discover is due.

91.   The conversions ,have not only increased the number of shares due to Discover to a value equal to the amount owed prior to the conversion/exercise, but have actually led to a requirement to issue a number of shares higher than the amount due prior to the conversion/exercise which was just completed. The conversions thus create a situation where every issuance to Discover creates a need for Camber to issue exponentially more shares than was due prior to the conversion/exercise, instead of less.   For example, on October 27, 2016, Discover requested 920,000 shares of common stock from the total shares due in connection with the prior exercise of the Warrant by Discover (when Discover exercised the Warrant in full on October 7, 2016, it was due all 1,384,616 shares issuable in connection therewith and an ever increasing number of shares for the Conversion Premium, but has only been requesting that number of shares of Camber common stock, from time to time, which totals no more than 4.99% of Camber's outstanding common stock, with the

remaining shares held in abeyance until requested by Discover), which at that time totaled 6,385,083 shares (1,384,616 shares in connection with the exercise of the Warrant and 5,000,467 shares for the $5,355,000 Conversion Premium that Discover alleged was due, including certain shares previously issued to Discover). After Discover sold those 920,000 shares which it was issued on October 27, 2016, the price of Camber's common stock declined in value and at the time of Discover's November 14, 2016 request for additional shares, Discover alleged it was then due an aggregate of 9,107,431 shares of common stock (1,384,616 shares in connection with the exercise of the Warrant and 7,722,815 shares for the $5,355,000 Conversion Premium that Discover alleged was due, including certain shares previously issued to Discover), which represented an increase of 2,722,348 shares of common stock compared to the number due as of October 27, 2016. Put another way, by Discover requesting shares, which were then sold into the market place, and decreased the price of Camber's common stock, Discover actually came out ahead in that it was due an additional 2,722,348 more shares, which based on a closing price of $0.99 per share on November 14, 2016 were worth an additional $2,722,348.   Virtually every time Discover receives shares in connection with the conversion/exercise of the Securities and sells the shares,

the number of shares Discover is due actually increases by more than the value of the shares issued, and Discover increases its total return on investment. Discover is in a no lose situation.

92.   As such, Discover has a never ending right to receive additional shares of Camber common stock and can, as long as Camber stays in business and its common stock continues to trade, receive an infinite return on its investment.

93.   An infinite return on investment is clearly, in every sense of the definition of usury, an excessive and abusive return on investment, and creates a situation where the Securities are so extremely unjust and overwhelmingly one-sided in favor of Discover, that they are contrary to good conscience.

94.   The possible infinite return on Discover's investment, at the expense of Camber's stockholders, who will suffer almost complete dilution, and who will see the value of their securities decline to nothing, if the terms of the Securities as interpreted by Discover are allowed to stand, are unconscionable, and will quickly lead to Camber losing its listing with the NYSE MKT and being forced into bankruptcy, with no way to raise additional funding through the sale of securities, or utilize securities for acquisitions, and no good will left from shareholders who continually witness Camber's stock price declining in value.

95.   Due to Discover's sales of shares and the resulting decreases in Camber's stock price, Camber has lost over $28.2 million dollars in market capitalization. Camber has been injured in its business and/or property and has been damaged in the amount of approximately $67.6 million – consisting of $28.2 million in lost market cap and $39.4 million in lost projects.

96.   **FIFTH CLAIM – UNJUST ENRICHMENT (AGAINST ALL DEFENDANTS)**:

97.   Camber realleges and incorporates by reference paragraphs 1 through 95 above as though fully set forth herein.

98.   It would be inequitable for Discover to be allowed to retain the benefit of the Securities it converted and sale of Camber stock.

99.   Camber is therefore entitled to restitution and disgorgement from Defendants.

100.   **SIXTH CLAIM – 10b-5 VIOLATIONS (AS TO DISCOVER)**:

101.   Camber realleges and incorporates by reference paragraphs 1 through 99 above as though fully set forth herein.

102.   The conduct of Discover violates SEC Rule 10b-5 (promulgated under the Securities Exchange Act of 1934, as amended (the "***Exchange Act***")).  Rule 10b-5: Employment of Manipulative and Deceptive Practices:  "It shall be unlawful for any person, directly or indirectly, by the use of any means or

instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,  (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

103.   Discover directly and indirectly used the means and instrumentalities of interstate commerce, the mails and/or interstate wires in connection with their scheme to defraud and manipulate as set forth above.

104.   Discover employed devices, schemes and artifices to defraud and to manipulate Plaintiff's stock price, made untrue statements of material fact, and omitted to state material facts necessary to make their statements not misleading, and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Plaintiff.

105.   Discover was a primary participant in the wrongful and illegal conduct.

106. Discover acted with intent to deceive, manipulate and defraud the Plaintiff. Defendants acted with actual knowledge, or at a minimum severe recklessness, knowing that the omissions and statements referenced herein were false and misleading, and the failure to disclose material facts and make accurate representations as to its actual and intended plans and trading induced Camber to do business with Discover and to issue stock to Discover.

107. At the time of the misrepresentations and omissions alleged herein, Camber believed all statements and assurances made by Discover were true and was unaware of any of the omitted facts, such as Discover's intent to manipulate Camber's stock as alleged in this pleading.  Had Camber known the full facts, Camber would never have entered into the Discover Documents with Discover.

108. As a direct and proximate result of the wrongful conduct of Discover, Camber suffered damages and is consequently entitled to all relief available under the Exchange Act, including compensatory damages against Discover for all damages suffered as a result of Discover's wrongdoing, in an amount to be proven at trial, with interest thereon; the costs and expenses of this action; and other relief which the Court may find just, appropriate or legally warranted.

109. **SEVENTH CLAIM – DECLARATORY JUDGMENT**:

110. Camber realleges and incorporates by reference paragraphs 1 through 108 above as though fully set forth herein.

111. Camber, as an entity interested in a writing, seeks to settle and obtain relief from uncertainty with respect to rights, status and other legal relations between Camber and Discover.   Specifically, Camber is seeking a declaration that the Discover Documents are void as the agreements are opposed to public policy and should be declared void.

112.   Alternatively, Camber seeks a declaratory judgment that:

    A.    No Trigger Event has occurred under the Debenture, Warrant or Preferred Stock to date;

    B.    The Premium Rate (i.e., the interest rate) of the Warrant is fixed at 7% (i.e., that because no Trigger Event occurred, the 10% automatic increase in the Premium Rate (i.e., the interest rate) alleged by Discover never occurred.

    C.    Because no Trigger Event occurred, the conversion rate of the Conversion Premium of each of the Securities is (and has always been) 95.0% of the average of the 5 lowest individual daily volume weighted

average prices (VWAP) of Camber's common stock during the applicable Measurement Period.

D.   The Measurement Period for each of the Securities begins 30 trading days before the first exercise or conversion of each Security, and extends to 30 trading days after, the number of shares stated in the initial conversion/exercise notice provided by Discover for the first conversion/exercise of each Security by Discover, have actually been received into Discover's designated brokerage account in electronic form and fully cleared for trading.

E.   Each reference in the definition of Measurement Period of each of the Securities to a Section I.G.6.h of each of the Securities (which sections either do not exist or refer to sections which are nonsensical), has no meaning or effect on the length of the Measurement Period.

F.   The references in the definition of Trigger Event of each Security to "timely filing when first due all periodic reports", means filing each periodic report within the time period required by the SEC, including accounting for any time extension allowed pursuant to SEC Form 12b-25.

G.    Because no Trigger Event occurred under the Debenture prior to the closing of the acquisition of assets contemplated by that certain Asset Purchase Agreement dated December 30, 2015 between Camber and the sellers named therein, as disclosed in the current report on Form 8-K filed by Camber with the SEC on December 31, 2015 (defined as the "***Acquisition***" in the Debenture), which transaction closed on August 25, 2016, the Conversion Premium and other conversion terms of the Debenture were locked as of the date of the Acquisition and the Debenture was automatically converted into Camber's common stock on such date pursuant to the automatic conversion terms of the Debenture (Section G.8. thereof).

113.   **EXEMPLARY DAMAGES**:

114.   Through their above described conduct, the Defendants acted with fraud, malice or gross negligence, and as such are liable to Camber for exemplary damages.   Camber requests exemplary damages in an amount to be determined by the trier of fact.

115. **<u>INJUNCTIVE RELIEF</u>**:

116. **<u>Irreparable Harm/Inadequate Remedy at Law</u>**

117. If Discover, its agents, subsidiaries, predecessors, successors, partners (both general and limited), officers, directors, employees, representatives, assigns, affiliates and anyone or any entity acting in concert with them are not restrained, directly or indirectly, from converting/exercising the Securities, selling Camber shares, and from shorting or pledging any Camber shares, Camber will continue to suffer immediate and irreparable harm as Camber's share price will decrease to the point Camber is delisted from the NYSE (namely, Camber's common stock will soon fail to comply with NYSE rules, which require a thirty day average closing price of at least $0.30 per share, no trades below $0.06 per share, and certain minimum market capitalization rules) and put out of business. Discover's conduct is destroying Camber's access to capital, its shareholders value in its securities and its ability to pursue its business plans.

118. Federal courts generally apply a two-step analysis. First, federal courts determine if there is (1) a likelihood of success on the merits, (2) a threat of irreparable harm, and (3) an inadequate remedy at law. If those conditions are

satisfied, the court must then (4) balance the hardships, and (5) consider the impact on public interest.

119.   A plaintiff must establish four elements to secure a preliminary injunction: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.  *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir.2009); accord, e.g., *Wilson v. Office of Violent Sex Offender Mgmt.*, 584 Fed. Appx. 210, 212 (5th Cir.2014).   An injunction is deemed an extraordinary remedy, *Douthit v. Dean*, 568 Fed. Appx. 336, 337 (5th Cir.2014); see also *Munaf v. Geren*, 553 U.S. 674, 689, 128 S. Ct. 2207, 2219, 171 L.Ed. 2d 1 (2008); *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir.2009) (similarly characterizing a temporary restraining order), a preliminary injunction aims "to prevent irreparable injury so as to preserve ... [a] court's ability to render a meaningful decision on the merits,"  *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 627 (5th Cir.1985) (citing to *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir.1975)); accord, e.g., *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163

F.3d 341, 348 (6th Cir.1998); *United States v. Alabama*, 791 F.2d 1450, 1460

(11th Cir.1986) (adding that "[p]reliminary injunctive relief may be necessary

to insure that a remedy will be available" at some future date).

120. By circumstance and necessity, in considering whether either a preliminary

injunction or a temporary restraining order should issue, a court is "almost

always" forced to rely upon "[an] abbreviated set of facts." *Klitzman,*

*Klitzman & Gallagher v. Krut*, 744 F.2d 955, 958 (3d Cir.1984); accord *Texas*

*v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir.1975)

121. In applying the four factor test, "none of the four prerequisites has a fixed

quantitative value. Rather, a sliding scale is utilized, which takes into account

the intensity of each in a given calculus." *Seatrain Int'l, S.A.*, 518 F.2d at 180.

This often "requir[es] delicate balancing of the probabilities of ultimate

success at final hearing with the consequences of immediate irreparable

injury." *Klitzman*, 744 F.2d at 958;

122. Plaintiffs must establish a "substantial likelihood of success." This phrase

has been defined in different ways. Compare 11A CHARLES A. WRIGHT et

al., FEDERAL PRAC. & PROC. § 2948.3 (3d ed.) ("reasonable probability

of success"), with Terex Corp. v. Cubex, Ltd., No. 3:06-CV-1649-G ECF,

2006 U.S. Dist. LEXIS 88863, at *7-8, 2006 WL 3542706, at *2 (N.D.Tex.

Dec. 7, 2006) ("more than negligible," and noting the existence of a debate regarding this element's extent among the various circuits and summarizing older Fifth Circuit case law); *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011) ("Under ... [the sliding scale] approach 637*637 [employed in several circuits], the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.")

123. Still, at such an early stage, courts are not required "to draw the fine line between a mathematical probability and a substantial possibility of success." *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir.1981); accord, e.g., *KTM N. AM., INC. v. Cycle Hutt, Inc.*, No. 13-5033-JLV, 2013 U.S. Dist. LEXIS 67209, at *14, 2013 WL 1932797, at *5 (D.S.D. May 8, 2013). And none of the prerequisites for a preliminary injunction have "a fixed quantitative value." *Seatrain Int'l, S.A.*, 518 F.2d at 180; see also, e.g., *EnVerve, Inc. v. Unger Meat Co.*, 779 F.Supp.2d 840, 843 (N.D.Ill.2011) ("The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." (internal quotation marks omitted).

124.   "'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment."  *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir.1992).

125.   **Probable Right to Relief Sought**.

126.   Camber can establish a probable right to the relief sought because Discover is using the fraudulent Discover Documents to convert and sell virtually unlimited shares of Camber, a publicly traded company.

127.   **Probable Injury**.  Generally, a party seeking the issuance of a preliminary injunction must show it will suffer irreparable injury if the injunction does not issue and must show entitlement to the relief sought.  A prima facie showing that the party will prevail on the merits of the case is sufficient to meet this requirement.

128.   There is no question that if Discover continues converting/exercising the Securities and selling Camber shares, or continues to short or pledge Camber shares, Camber will continue to suffer immediate and irreparable harm as Camber's share values will decrease to the point Camber is delisted from the NYSE (namely, Camber's common stock will soon fail to comply with NYSE rules, which require a thirty day average closing price of at least $0.30 per

share, no trades below $0.06 per share, and certain minimum market capitalization rules) and put out of business. Discover's conduct is destroying Camber's access to capital, its shareholders value in its securities and its ability to pursue its business plans.

129. An irreparable injury is one which the injured party cannot be adequately compensated by damages, or the damages cannot be measured by a certain pecuniary standard.  Injunctive relief is not to be denied solely on the existence of a remedy at law; the remedy must be as practical and efficient to the ends of justice as the equitable remedy.

130. Under these circumstances, Camber has demonstrated a probable right of recovery, imminent harm and irreparable injury.  Unless immediate relief is granted, irreparable injury will certainly result.

131. Discover has already profited from the deception and fraud and thus no actual harm comes to Discover.  Camber, on the other hand, risks complete devastation.

132. **TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**:

133. For each of the reasons stated above and the facts set forth herein, Camber requests the entry of a temporary restraining order and, upon hearing, a

preliminary injunction enjoining Discover and Fifth Third, its agents, employees, subsidiaries, predecessors, successors, partners (both general and limited), officers, directors, employees, representatives, assigns, affiliates and anyone or any entity acting in concert with them from converting/exercising the Securities, selling Camber shares, and shorting or pledging Camber shares. Otherwise, Camber will continue to suffer immediate and irreparable harm as Camber's share values decrease to the point Camber is delisted from the NYSE and put out of business if such temporary restraining order and preliminary injunction are not granted. Discover's conduct is destroying Camber's access to capital, its shareholders value in its securities and its ability to pursue its business plans.

134. **<u>Bond</u>**

135. Camber is willing to post a bond in the amount determined by the Court.

136. Given the fact that Discover had already profited in the millions on this transaction, combined with the fact that Camber cannot raise any capital/equity without Discover's permission, a bond in this case should be less than $10,000.

137. Rule 65 allows a court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  FED. R. CIV. P. 65(c). This requirement, however, may be waived where the gravity of interest is great and no proper showing of a harm's likelihood or a probable loss is made. See, e.g., *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.1996) ("In holding that the amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court, we have ruled that the court may elect to require no security at all." (internal quotation marks omitted)); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir.1981) (same).

138. **<u>ATTORNEY'S FEES</u>**:

139. As a result of the Defendants' conduct, Camber has been required to engage legal counsel to prosecute this action.  Camber has agreed to pay the attorney a reasonable fee for his services.  Based upon one or more of the foregoing causes of action and/or as permitted under the law, Camber requests recovery of a reasonable and necessary attorney's fee in this cause.

140.   **<u>REQUEST FOR RELIEF</u>**:

141.   THEREFORE, Camber requests that Defendants be cited to appear and that upon final trial hereof the Court award Camber as follows:

    A.    judgment against Defendants for all actual damages, and if shown, consequential damages (including lost profits), special damages (including lost profits) and incidental damages, Camber seeks actual damages, consequential damages (including lost profits), special damages (including lost profits) and incidental damages as to each cause of action;

    B.    exemplary damages as allowed by law;

    C.    a temporary restraining order and a preliminary injunction as outlined above;

    D.    attorney's fees as allowed by law;

    E.    pre-judgment interest, if any, at the highest rate allowed by law, if any;

    F.    post-judgment interest, if any, at the highest rate allowed by law, if any;

    G.    costs of court; and

H.      such other and further relief to which Camber may be entitled.

142.    Respectfully submitted this 9th day of May 2017.

By: _____

Timothy J. Henderson
State Bar №. 09432500
Southern District of Texas №. 955
6300 West Loop South, Suite 280
Bellaire, Texas  77401-2905
713.667.7878
713.668.5697 (fax)
timjhenderson@msn.com

COUNSEL FOR PLAINTIFF,
CAMBER ENERGY, INC.

JURY DEMANDED

OF COUNSEL:

David Loev, Esq.
State Bar №. 24002490
John Gillies, Esq.
THE LOEV LAW FIRM, PC
6300 West Loop South, Suite 280
Bellaire, Texas 77401-2905
713.524.4110
713.524.4122. (fax)
dloev@loevlaw.com
john@loevlaw.com